# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 15, 2011 Session

## CHARLES WADE MCGAHA v. STATE OF TENNESSEE

### Direct Appeal from the Circuit Court for Cocke County
### No. 1300    Rex Henry Ogle, Judge

### No. E2010-01926-CCA-R3-PC - Filed May 26, 2011

A Cocke County jury convicted the Petitioner, Charles Wade McGaha, of first degree murder and aggravated assault. The Petitioner filed a petition for post-conviction relief, which appointed counsel amended to allege the petitioner received the ineffective assistance of counsel. After a hearing, the post-conviction court denied relief, and the Petitioner now appeals. After a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Benjamin S. Burton, Sevierville, Tennessee, for the Appellant, Charles Wade McGaha.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; James B. Dunn, District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Trial

On direct appeal, this Court summarized the facts underlying this case as follows:

> Lisa Mathis testified that she lived in a mobile home located at 115 Horn Way in Newport. Prior to the events of May 31, 2004, she did not know either the Defendant or co-defendant Daniels. However, that evening while Mathis was at her house with the homicide victim and Charles Adams, Daniels

arrived uninvited, came in the front door, looked at the homicide victim and said, "We have a problem." After picking up a baseball bat, Mathis told Daniels to leave. As Daniels backed out the front door, he said, "I'll be back with something more than a stick."

At approximately 10:15 p.m. that night, Daniels returned to Mathis's house, and the Defendant was with him. At that time, there were five people in the two-bedroom mobile home: Mathis was in the kitchen and Charles Adams was in the living room, while the victim was in a back bedroom with Michael Benson and David Shults. Mathis saw that Daniels had a handgun when he got out of his car, and she called 9-1-1 as he entered and walked past her through the living room toward the back of the mobile home.

The Defendant-who was armed with a rifle-followed Daniels inside, pointed the rifle at Mathis's head and said, "Drop the phone." The Defendant then asked her "where the son of a bitch was," and she assumed he meant the victim. At that point, Mathis became "hysterical": she dropped the telephone, threw up her hands, got on her knees and started screaming. The Defendant did not shoot at her, but he held the rifle "in [her] face" so close that she "could have grabbed the barrel from where he was standing." They heard a gunshot from the rear of the house, and the Defendant ran to the bedroom where the victim was located. Mathis then ran out of the house. As she fled to her closest neighbor's home, she heard a second gunshot, and testified that it was "a different type shot." When she arrived at her neighbor's, she was still "hysterical" and screaming that there were "people in [her] house with guns." Her neighbor called 9-1-1.

The audiotape of Mathis's initial 9-1-1 telephone call (placed from her residence) was played for the jury. While listening to the recording, Mathis identified her own voice and the voice of Michael Benson saying, "I just want to leave." She also identified the Defendant's voice demanding, "[W]here's the son of a bitch at?" On cross-examination, Mathis stated that she thought the four men in her house that day had been drinking, but that she was "not sure"; however, she did not see anyone at her house using cocaine that day.

Michael Benson testified that he was at Mathis's house on May 31, 2004. He arrived there "between 8:00 and 9:00" p.m. with David Shults. At some point, Shults and the victim took Mathis to a store where she purchased beer. After bringing her back to the house, the two men again went out and purchased drugs. After they returned, Benson went into a back bedroom with

2

the victim, David Shults and Charles Adams. Benson said they "were getting ready to use drugs," when Daniels entered the bedroom "with a pistol and pointed it at [the victim]." While Daniels was "waiving" the pistol at the victim and yelling, Benson "hit the door a flying" and ran outside. Benson passed the Defendant in the living room on his way out and said the Defendant was holding a rifle. While hiding behind a tree, Benson heard two gunshots. He then saw two cars leave and confirmed that one car belonged to David Shults. The second car was a Subaru, but Benson did not know to whom it belonged.

Charles Adams testified that he knew the victim and that he had known the Defendant and Daniels most of his life. On May 31, 2004, Adams went to Mathis's house with the victim. While they were at the mobile home that evening, Daniels arrived, came inside and told the victim that "they had a problem." Mathis picked up a baseball bat and told him to leave, and as he was leaving, Daniels said "he'd be back with more than a baseball bat."

According to Adams, after Daniels left he and Mathis watched television in the living room and the victim went into a back bedroom with two men Adams did not know. "A little later," Daniels came back to the house and the Defendant was with him. When he saw Daniels and the Defendant "on the steps," Adams went into the back bedroom to warn the victim that "they had come back." Daniels came inside the bedroom first, and he was armed with a pistol. "He shot it and when he shot it him and [the victim] got into a quarrel and started wrestling." The Defendant then came into the bedroom armed with an "assault rifle" outfitted with "two banana clips taped together." Adams testified that while in a "wrestling hold" with the victim, Daniels "said shoot this S.O.B. and [the Defendant] shot him" with the rifle from a distance of approximately four feet.

Daniels then pointed his pistol at Adams and "acted like he pulled the trigger," then he told the Defendant to shoot Adams. The Defendant responded that he would not shoot Adams because they were friends. As Daniels and the Defendant left the bedroom, Daniels said, "Say it was self defense." Adams watched the Defendant and Daniels drive away in a Subaru. Asked whether there was any doubt in his mind that the Defendant shot the victim, Adams answered: "No, sir."

Eryn Wilds testified that she was working at a "BP" gas station in Newport on the day of the incident. Daniels came to the gas station twice that

day. On the second occasion, he arrived at approximately 10:15 p.m. driving a Subaru and was acting "sort of hyper." There was another white male in the car with Daniels whom Wilds could not identify.

Detective Derrick Woods of the Cocke County Sheriff's Department testified that he led the investigation of the homicide. He arrived at Mathis's home at approximately 11:00 p.m. on May 31, 2004, and saw that the victim was dead on the floor in a back bedroom with a single bullet exit wound on the upper-right-side of his chest and blood spatter on his face. The bullet entry wound was on the lower-left-side of the victim's back. Based on where the body was and the location of a bullet hole in the bedroom wall, Detective Woods opined that the "shooter" would have been standing in the doorway coming into the bedroom. There was also a bullet hole that went "through the mattress, through a pillow," and through the side of the trailer.

Detective Woods informed that one cartridge casing from a rifle bullet was found on the floor beside a night stand, and a handgun cartridge casing was discovered on the bed. Detective Woods submitted both cartridges to the Tennessee Bureau of Investigation Crime Laboratory for analysis. The crime laboratory report confirmed that the cartridge casing recovered from the bedroom floor was a "7.62 by 39 mm caliber rifle cartridge" casing and that the cartridge casing recovered from the bed was from a "40 caliber" Smith and Wesson cartridge. No fingerprints were recovered from either cartridge casing. Because both bullets fired in the bedroom exited the trailer, neither was recovered. No firearms were discovered at the crime scene, and the murder weapon was never found. According to Detective Woods, the Defendant and Daniels turned themselves in to authorities the day after the shooting.

The parties stipulated that the Tennessee Bureau of Investigation's examination of items removed from a 1985 Subaru "failed to indicate the presence of blood." Further, they stipulated that analysis of a vitreous sample taken from the victim, as well as analysis of his blood and urine revealed that he had a blood alcohol content between .19 and .25 percent when he died. Additionally, the victim had marijuana and cocaine in his system.

Kim Fine testified that she was the victim's girlfriend. Approximately two and a half to three years before she dated the victim, Fine had been Daniels's girlfriend. She lived with Daniels for eight months and explained that on "several occasions," Daniels would speak of the victim and say that if

4

he ever "ran into him one of the two of them would die." The victim had informed Fine as to the nature of the dispute between him and Daniels, but this information was not disclosed during her testimony.

Dr. Darinka Mileusnic-Polchan testified that she was a forensic pathologist, an Assistant Professor of Pathology at the University of Tennessee Medical Center and an Assistant Chief Medical Examiner for Knox County. Testifying as an expert in forensic pathology, she stated that she conducted an autopsy on the victim and opined that his cause of death was "a single gunshot wound to the back which perforated the left lung and tore the heart and exited the body on the front. It was a through and through gunshot wound of the back that involved the chest organs that caused internal bleeding." Dr. Mileusnic-Polchan also deduced that the victim was shot from a close range while he was "standing up and potentially slightly bent [over]."

*State v. Charles Wade McGaha*, No. E2006-01984-CCA-R3-CD, 2008 WL 148943, *1-4 (Tenn. Crim. App., at Knoxville, Jan. 16, 2008), *perm. app. denied* (Tenn. June 23, 2008). Based on the evidence, the Cocke County jury convicted the Petitioner of first degree murder of the victim and aggravated assault of Mathis. The trial court sentenced the [Petitioner] to life for his first degree murder conviction and to ten years for his aggravated assault conviction and ordered the sentences to be served concurrently. This Court affirmed the Petitioner's convictions and sentences on direct appeal. *See id*. at *6.

### B. Post-Conviction

The Petitioner filed a timely petition for post-conviction relief, and the post-conviction court appointed counsel, who amended the petition to allege that trial counsel was ineffective because she failed to: (1) request a severance of the Petitioner's and the co-defendant's cases; (2) interview witnesses; (3) investigate the case; (4) present the affirmative defense of alibi; (5) object to gruesome photographs admitted into evidence; (6) present evidence at trial and at the sentencing stage; and (7) hire or consult with expert witnesses.

The post-conviction court held a hearing on the petition, wherein the Petitioner presented the following evidence: Trial counsel for the Petitioner ("Counsel") testified that she was appointed to represent the Petitioner in this case. Though Counsel had participated as co-counsel during jury trials, the Petitioner's murder trial was her first solo jury trial. She testified that, after the jury convicted the Petitioner, she filed the Petitioner's direct appeal and, when this Court affirmed his convictions, she applied for permission to appeal to the Supreme Court.

5

Counsel confirmed that no bullets were found at the crime scene and that the State attributed this to the Petitioner having used a long, high-powered rifle, which caused a "through and through" bullet entry. Counsel recalled that a 9-1-1 tape obtained in this case established that the murder occurred sometime after 10:00 p.m. because shots could be heard in the background of the tape. Neither Counsel nor anyone she employed went to the scene of the crime because photographs of the trailer were more than adequate, in Counsel's opinion, to convey an accurate understanding of the layout of the crime scene.

Counsel testified that, although four to five people were inside the trailer at the time of the shooting, she interviewed only Mathis and the man who was in the bedroom when the Petitioner allegedly shot the victim. She explained that she did not interview the other people present because they had fled the trailer when the shooting began. Counsel testified that an investigator was unnecessary for this case based upon the Petitioner's position that he was not at the scene of the crime and because she herself was able to uncover the criminal histories of each of the State's witnesses. She confirmed that Mathis testified that a voice heard shouting, "Where's the son of a bitch?" in the background of the 9-1-1 tape belonged to the Petitioner. Counsel testified that police found a "buffet" of drugs at the trailer and that all its occupants appeared to have been "partying" that night. She confirmed that the victim's autopsy report revealed the presence of alcohol and marijuana in his system.

Counsel confirmed that she did not move to sever the Petitioner and his co-defendant's trials but acknowledged that perhaps she "should have" done so if only to "cover all bases." She testified she believed severance was unnecessary because the Petitioner and co-defendant were in the same room during the shooting. Counsel "felt certain that the court would have one hundred percent not allowed [severance]" in this case. She testified that she would not have changed anything about her trial strategy even if the trials had been severed.

Counsel confirmed that the Petitioner's chief defense at trial was to argue that he was not present during the shooting. Counsel testified that the Petitioner had previously been convicted of murdering his brother and that she did "everything in [her] power" at trial to ensure that no witness testified that the Petitioner was a "peace-loving" man because such testimony would open the door to introduction of the Petitioner's prior conviction for murdering his brother. She testified that she considered bringing an alibi defense based on the Petitioner's family members' statements that they heard his voice in the background of a telephone call placed to Davis's home at approximately the same time of the shooting. She recalled that she meticulously examined the time line, mapping out each party's movement minute by minute. Though she could not recall exactly how long it took to drive from Davis's house to the crime scene, she knew it took less than one hour. After Counsel spoke with the Petitioner's family members, however, she determined that "there was a huge gap and . . . more than enough time" for him to be both in the background of the telephone call

6

and, later, present at the crime scene during the murder. Therefore, she concluded that there was "no way" she could establish an alibi defense. Counsel testified that she was also hesitant to call the Petitioner's family members to testify because she was afraid they would testify that the Petitioner was a loving, "sweet" man and thereby allow the State to introduce the Petitioner's prior conviction for murdering his brother. As a result, Counsel did not pursue an alibi defense.

Counsel testified that she did not present evidence during the sentencing hearing in this case. She explained that, rather than focus on the length of the Petitioner's sentence, she focused on avoiding consecutive sentencing. She recalled that she argued that, because co-defendant Daniels received concurrent sentencing, the Petitioner also should receive concurrent sentencing.

Alma McGaha, the Petitioner's sister, testified that at 10:25 p.m. on the day of the shooting, she called her nephew, Ben Daniels, who earlier had asked to use her shower. She called him to tell him to "hurry up" and come over to shower because she wanted to go to bed. He replied that he could not come over immediately because, if he gathered up his toiletries and clothing, he would wake up his uncle, the Petitioner. At this point, Alma heard the Petitioner say in the background "I've been trying to sleep all evening and I can't sleep for the phone ringing." Her nephew at this point told her that he would gather his things and come over, and she heard the Petitioner say, "Next time the phone rings, I'm going to unplug it, . . . because I got to get up in the morning and make John Dale some money."

Alma testified that, when she found out that the murder in this case, which took place in Cosby, Tennessee, allegedly occurred at 10:16 p.m., she notified Counsel of this phone call because "nobody [could] get there that quick."

On cross-examination, Alma said she knew it was the Petitioner in the background and not her other brother Mark because she saw the Petitioner at Ben Daniels's home earlier in the day at 5:00 p.m. and because Mark was living in Carson Springs, Tennessee, at the time.

Joseph McGaha, Alma McGaha's son and the Petitioner's nephew, testified that around 10:00 p.m. on the day of the shooting in this case, he took a shower. After he exited the shower, he picked up the phone and overheard his mother speaking with his cousin Ben Daniels. He testified that he heard his uncle, the Petitioner, "scream" in the background to not call so late at night. He recalled that the Petitioner commonly drank a lot and sounded like he may have been drinking. Joseph testified that he was certain that it was the voice of the Petitioner and not that of his other uncle, Mark McGaha. On cross-examination, Joseph testified that the Petitioner's co-defendant James Daniels, was his cousin.

7

At the conclusion of the hearing, the post-conviction court found that the Petitioner failed to prove by clear and convincing evidence that he received the ineffective assistance of counsel, and it denied the Petitioner's request for post-conviction relief. The court later entered a written order reflecting its denial of the Petitioner's petition. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner claims that the post-conviction court's order denying relief forms an inadequate basis for our review because it does not address each of the claims of ineffective assistance of counsel alleged within his petition for post-conviction relief. The Petitioner also claims that the post-conviction court erred when it denied relief in this case because Counsel was ineffective for: (a) failing to move to sever the Petitioner's trial from that of his co-defendant; (b) failing to present an alibi defense; (c) failing to present proof at sentencing; and (d) failing to present proof of the Petitioner's intoxication.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth

8

Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n. 38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard,

9

then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

Initially, the Petitioner contends the post-conviction court failed to address each issue raised in his petition for post-conviction relief. Specifically, he contends the post-conviction court failed to address whether Counsel was ineffective for failing to request a severance of the Petitioner's trial from that of his co-defendant and whether Counsel was ineffective for failing to present evidence at sentencing.

The State responds that, although the post-conviction court never specifically addressed the Petitioner's severance and sentencing claims, the post-conviction court's oral findings at the post-conviction hearing form an adequate basis for its denial of relief. It points specifically to the post-conviction court's statement that it was "very impressed with Counsels' recollection of the case" and that Counsel "did a fantastic job" and "connected . . . well with the jury." Moreover, the State argues, the Petitioner failed to offer evidence in support of his ineffective assistance claims as to severance and sentencing at the post-conviction hearing. It argues that, absent a specific showing that the Petitioner would have been entitled to post-conviction relief on these issues, the lack of specific findings by the post-conviction court is harmless.

Tennessee Code Annotated section 40-30-111(b) provides, "Upon the final disposition of every [post-conviction] petition, the court shall enter a final order, and except where proceedings for delayed appeal are allowed, shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each ground." (2009). This requirement is mandatory; however, a post-conviction court's failure to comply does not always require reversal of the court's judgment. *State v. Swanson*, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984); *see also Michael H. Cammon v. State*, No. M2006-01823-CCA-R3-PC, 2007 WL 2409568, at *7 (Tenn. Crim. App. at Nashville, Aug. 23, 2007). "The primary intent of the legislature underlying this requirement is to facilitate appellate review of the lower court's proceedings, and the failure to meet the requirement neither constitutes constitutional abridgement nor renders the conviction or sentence of the appellant void or voidable." *Swanson*, 680 S.W.2d at 489. Therefore, a post-conviction court's failure to provide written findings of fact and conclusions of law may be deemed harmless if the post-conviction court orally set forth sufficient findings on the record. *See State v. Higgins*, 729 S.W.2d 288, 290-91 (Tenn. Crim. App. 1987).

10

At the conclusion of the post-conviction hearing in this case, the post-conviction court, who presided over the Petitioner's trial, noted that Counsel did a "really good job with the jury [and] connected . . . well with the jury," noting she was "asking questions and doing the things that I felt that she should have done." The post-conviction court found especially compelling the extra step Counsel took to appeal the Court of Criminal Appeals decision affirming his convictions to the Supreme Court. The court stated that, "based upon [his] observations of [Counsel] at the trial, [he] thought very few people could have done any better." It said, "I thought she did a fantastic job." The post-conviction court also found that "there [was] no showing of prejudice as it relates to the theories of the petition for post-conviction relief and that [Counsel], in the Court's opinion, magnificently complied with the mandates of the Sixth Amendment in the Strickland case."

In its written order dismissing the petition for post-conviction relief in this case, the post-conviction court specifically rejected the Petitioner's claim regarding Counsel's failure to present an alibi defense and his claim regarding Counsel's investigation of the case and found generally that "the Petitioner failed to prove by a preponderance of the evidence any of the other allegations of malfeasance or ineffective assistance of counsel raised in the Original Petition and Amended Petition for Post-Conviction relief.

In our view, the post-conviction court's extensive factual findings at the post-conviction hearing, in combination with its written finding that the Petitioner failed to prove his "other allegations of malfeasance or ineffective assistance of counsel raised [in his original and amended petitions]," form an adequate basis for our review. As such, we conclude that the record is adequate for our review. We now turn to the merits of the Petitioner's post-conviction claims.

**A. Failure to Sever the Petitioner's Trial from that of his Co-Defendant**

The Petitioner contends Counsel was ineffective because she failed to file a motion to sever in this case. He argues that such a motion would have been successful because the evidence showed that his co-defendant had a motive to kill the victim, whereas he himself did not have such a motive. As proof that the co-defendant had a motive to kill the victim, the Petitioner points to trial testimony that there was "bad blood" between his co-defendant and the victim and to the fact that, a few hours before killing the victim, his co-defendant warned the victim that he would be returning "with more than a stick."

The State responds that Counsel was not ineffective for failing to request a severance because Counsel believed the trial court would not grant a severance because the evidence against the Petitioner and his co-defendant was the same. The State argues that, because the Petitioner failed to show how the evidence was different, he failed to show how Counsel's

11

decision in this regard was unreasonable. The State argues further that, because Counsel testified she would not have altered her defense strategy if the Petitioner and his co-defendant's trials were severed, and the Petitioner failed otherwise to show how severance would have affected the outcome of his trial, the Petitioner failed to show how counsel's decision prejudiced him.

The question of severance is one addressed to the sound discretion of the trial judge. The denial of a motion to sever will not be grounds for reversal unless it appears that the defendants were prejudiced by the trial judge's refusal to sever. *State v. Coleman,* 619 S.W.2d 112, 116 (Tenn. 1981). Defendants may be joined in the same indictment if the various offenses were either "part of a common scheme or plan" or "were so closely connected in respect to time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others." Tenn. R. Crim. P. 8(c)(3)(i)(ii). A defendant is entitled to a severance from other defendants if "it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(i). If an out-of-court statement of a co-defendant makes reference to the defendant but is not admissible against the defendant, then the trial court may grant a motion to sever if the State intends to offer the statement in evidence at trial. Tenn. R. Crim. P. 14(c)(1).

In this case, Counsel testified at the post-conviction hearing that, were she to try the case again, she would move for a severance, but she explained she would do so only to "cover all bases." She stressed that a trial court would be extremely unlikely to grant a severance in this case due to the similarity of the evidence that would be introduced in the Petitioner and his co-defendant's trials. Counsel testified that, even had the Petitioner and his co-defendant been tried separately, she would not have altered her trial strategy.

The post-conviction court did not specifically address the Petitioner's claim that Counsel was ineffective for failing to move for a severance. Instead, the court found generally that Counsel did a "really good job with the jury [and] connected . . . well with the jury" and said she was "asking questions and doing the things that I felt that she should have done." The post-conviction court also found that none of the grounds alleged as ineffective assistance caused prejudice to the Petitioner.

We conclude that the post-conviction court correctly denied relief based on this claim. Given that "close connection" of the "time, place, and occasion" of the Petitioner and his co-defendant's crimes in this case, "it would be difficult to separate proof of one charge from proof of the others." *See* Tenn. R. Crim. P. 8(c)(3)(i)-(ii). The Petitioner did not present evidence to establish either that being tried jointly with his co-defendant prevented him from

presenting certain evidence or defenses or that being tried jointly led to introduction of harmful evidence that would not otherwise have been admitted. Therefore, a motion by Counsel for severance almost certainly would have been denied. Thus, Counsel's decision to forego a severance motion was objectively "reasonable." *See House*, 44 S.W.3d at 515. Finally, Counsel's decision to forego a severance motion did not prejudice the Petitioner. *See Strickland*, 466 U.S. at 694. Because the Petitioner failed to prove either that Counsel was ineffective or that her actions prejudiced the outcome of his trial, he is not entitled to relief on this issue.

## B. Failure to Present Alibi Defense

The Petitioner argues Counsel was ineffective for failing to present an alibi defense on his behalf. Petitioner asserts that two family members could have testified that they heard the Petitioner's voice at Daniels's home, in the background of a telephone call, at approximately the time of the offense. He argues that Counsel's explanation for why she did not pursue an alibi defense was unreasonable. He argues that her time line which indicated that the Petitioner could have been present at the murder scene and then later at Daniels's house during the phone call was unreasonable. The Petitioner points out that Counsel never visited the crime scene and that his family members testified that they heard him in the background of the phone call to Daniels's home only ten minutes after the murder occurred. The Petitioner contends that, because his family members' testimony constituted "credible evidence" that "fairly raised" an alibi defense, Counsel was ineffective for failing to present an alibi defense.

The State responds that, although the Petitioner attempted to show at the post-conviction hearing that his family members would have provided him an alibi defense, the trial court did not find his family members' testimony credible, and his family members failed to support their claims with phone records. The State argues that, given the Petitioner's failure to present "credible witnesses" who could corroborate his claim that he was not at the scene of the crime, he failed to establish that an alibi defense would have been successful if raised. The State argues that, notwithstanding the likely failure of an alibi defense, Counsel's decision to forego an alibi defense was reasonable given her fear that such a defense would "open the door" to evidence of the Petitioner's prior murder conviction. Finally, the State argues that, even were Counsel's decision unreasonable, it did not change the outcome of the trial because an eyewitness identified the Petitioner as the shooter.

At the post-conviction hearing, Counsel testified that Alma and Joseph McGaha

13

contacted her about an alibi for the Petitioner. They offered to testify that they saw the Petitioner at Ben Daniels's house shortly before the murder and that, thus, the Petitioner would have had insufficient time to travel from this house to the murder scene to commit the murder. Counsel testified that she thoroughly researched the time line surrounding the murder and the distance between the Daniels house and the murder scene. Counsel determined that Alma and Joseph McGaha's statements would not actually constitute an alibi because the Petitioner would have had "more than enough" time to travel from the Daniels house to the murder scene. Thus, Counsel did not believe the testimony would be helpful in providing a defense for her client. Furthermore, Counsel testified that she feared that, if Alma or Joseph testified, one would mention that the Petitioner was a "good" or "peace-loving" person, thereby opening the door to the Petitioner's prior conviction for murdering his brother. Based on these considerations, Counsel chose not to pursue an alibi defense.

The post-conviction court found that Alma and Joseph McGaha's testimony was not credible. The post-conviction court instead credited Counsel's testimony and found that Counsel investigated the Petitioner's potential alibi defense and made a strategic decision not to use it. The evidence does not preponderate against these factual findings by the post-conviction court. *See Fields*, 40 S.W.3d at 456-57.

We agree with the post-conviction court that Counsel's decision to not raise an alibi defense was reasonable. Counsel investigated Alma and Joseph McGaha's claims and determined that their information did not exculpate the Petitioner. Counsel also feared that, by allowing Alma or Joseph to testify, she could inadvertently open the door to the introduction of the Petitioner's prior conviction for murdering his brother. Given her conclusion that Alma and Joseph's testimony would be not only unhelpful but also potentially disastrous, we conclude that Counsel's decision to forego an alibi defense did not fall below "an objective standard of reasonableness." *Strickland,* 466 U.S. at 690; *Mitchell*, 753 S.W.2d at 149; *House*, 44 S.W.3d at 515. The Petitioner is not entitled to relief on this issue.

**C. Decision to Present no Proof at Sentencing**

The Petitioner contends Counsel was ineffective because, rather than present proof at the sentencing hearing, she merely met with the State's attorney and asked him to make a sentencing offer. The State responds, because the Petitioner failed to either explain what evidence Counsel should have presented, or present this evidence at his post-conviction hearing, the Petitioner failed to show how Counsel's inaction was unreasonable or how it prejudiced him.

14

The post-conviction court did not specifically address the Petitioner's claim that Counsel should have presented evidence at sentencing. Instead, the court found generally that Counsel did a "fantastic job" and that "very few people could have done any better." The post-conviction court also found that none of the grounds alleged as ineffective assistance caused prejudice to the Petitioner.

In this case, Counsel acknowledged that she focused on securing the State's agreement to concurrent sentencing rather than offering evidence in support of a shorter sentence. The Petitioner did not identify any particular evidence that Counsel should have introduced at sentencing that would have changed the outcome of his sentencing hearing. Given this absence of proof, we are unable to determine how Counsel's failure to present evidence at sentencing prejudiced the Petitioner. Therefore, the Petitioner's claim that Counsel's representation at sentencing was ineffective must fail. *See Strickland*, 466 U.S. at 694. The Petitioner is not entitled to relief on this issue.

### D. Decision to Present no Proof of the Petitioner's Intoxication

The Petitioner contends that Counsel was ineffective for failing to offer the testimony of Joseph McGaha that, when he spoke with the Petitioner shortly after the murder, the Petitioner was intoxicated. He argues that, had Counsel presented such evidence, the jury might have found that the Petitioner's intoxication prevented him from forming the mens rea necessary to commit first degree murder. The State responds that, because Joseph McGaha testified at the post-conviction hearing only that it was "possible" that the Petitioner was intoxicated, the Petitioner failed to show by clear and convincing evidence that this testimony would have resulted in his acquittal of first degree murder.

The post-conviction court did not specifically address the Petitioner's claim that Counsel should have presented more proof of the Petitioner's intoxication at the time of the murder in order to establish that the Petitioner lacked the necessary mens rea to commit first degree murder. Instead, the post-conviction court found generally that Counsel did a "fantastic job" and that "very few people could have done any better." The post-conviction court also found that none of the grounds alleged as ineffective assistance caused prejudice to the Petitioner.

At trial, the evidence established that several drugs were found at the murder scene and that the victim was determined to have been under the influence of alcohol and marijuana at the time of his death. At the post-conviction hearing, Counsel described the murder scene

15

as containing a "buffet" of drugs and said that everyone present had been "partying." At the post-conviction hearing, Joseph McGaha testified that, when he heard the Petitioner in the background of the phone call his mother placed to Ben Daniels's home, he believed that, because the Petitioner was yelling and angry, it was "possible" the Petitioner had been drinking.

We conclude that the Petitioner has presented insufficient proof to support his claim that Counsel was ineffective for failing to present evidence of his intoxication at trial. None of the evidence at trial established that the Petitioner was under the influence of alcohol or drugs. Likewise, Joseph McGaha's testimony at the post-conviction hearing was similarly inconclusive as to the Petitioner's mental state. Thus, the Petitioner has failed to present "clear and convincing evidence" that proof existed that he was intoxicated at the time of the murder, that Counsel was aware of this proof, and that such proof would have led the jury to find he lacked the intent necessary to commit first degree murder. *See* T.C.A. § 40-30-110(f) (2006). Given these failings, we conclude that the Petitioner failed to establish either that Counsel was "unreasonable" for not presenting evidence of intoxication or that, had he presented such evidence, "the result of the proceeding would have been different" in a way that "undermines confidence in the outcome" of the Petitioner's trial. *Strickland*, 466 U.S. at 694; *Nichols*, 90 S.W.3d at 587. He is not entitled to relief on this issue.

## III. Conclusion

Having reviewed the record and relevant authorities, we conclude that the Petitioner failed to prove by clear and convincing evidence that he received the ineffective assistance of counsel. Therefore, the post-conviction court did not err when it denied his claim for post-conviction relief. As such, we affirm the post-conviction court's judgment.

_____

ROBERT W. WEDEMEYER, JUDGE

16